Filed 6/10/14  In re E.C. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | B252670<br>(Los Angeles County<br>Super. Ct. No. CK91251) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J.C.,<br><br>        Defendant and Appellant. | |

        APPEAL from an order of the Superior Court of Los Angeles County, Akemi Arakaki, Judge.  Affirmed.

        Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

J.C. ("Mother"), the mother of minors E.C. and Isaac G., appeals the order terminating her parental rights to E.C.[1] under Welfare and Institutions Code[2] section 366.26. On appeal she argues the order terminating her parental rights to E.C. must be reversed because the court erred in failing to grant her a contested hearing to prove that the beneficial parental relationship exception in section 366.26, subdivision (c)(1)(B)(i) applied to prevent the termination of her parental rights. As we shall explain, we disagree. Mother did not make a sufficient offer of proof to demonstrate that if given a full hearing that she could prove the exception would apply. In addition, based on the evidence that the court had before it at the hearing, the court did not err in terminating Mother's parental rights to E.C. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.      *Circumstances Leading to Detention of E.C. and Detention Proceedings*

E.C. came to the attention of the Department of Children and Family Services (the "Department") upon his birth at Whittier Presbyterian Hospital.[3] A referral from the hospital staff to the Department disclosed that Mother had a positive toxicology screen methamphetamines when she delivered E.C. Hospital records also indicated that Mother was using marijuana during the first trimester of her pregnancy. The newborn, E.C., also tested positive for exposure to amphetamines. According to hospital personnel, Mother was agitated, irritable, uncooperative, and combative prior to delivery. The hospital staff also expressed concern that Mother did not appear to be engaged with the baby or attuned

---

[1]      Mother does not appeal any order with respect to Isaac G.

[2]      All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3]      In late January 2012, the juvenile dependency court sustained a section 300 petition filed on behalf of E.C.'s sibling, Isaac G., based on a history of domestic violence between Mother and Isaac G.'s father, Sergio G., emotional abuse of Isaac G. by Mother, and Sergio G.'s history of substance abuse.

2

to his needs.  Mother did not feed or hold him; and Mother requested E.C. be taken to the nursery because he was crying and preventing her from sleeping.

Mother was interviewed by a Department social worker at the hospital.  The social worker observed that during a two-hour interview, Mother appeared disconnected from E.C. and did not focus or pay attention to the newborn.  Mother admitted she had used methamphetamine during her pregnancy.[4]

On March 5, 2012, the Department filed a section 300 petition on behalf of E.C. As subsequently amended and sustained by the juvenile court, the section 300 petition read as follows:

> "b-1  [¶]  [In February 2012], the child Baby [E.C.] was born suffering from a detrimental condition consisting of a positive toxicology screen for amphetamine.  Such condition would not exist except as the result of unreasonable acts by the child's mother, [J.C.], placing the child at risk of physical harm and damage.  Said substance abuse by the mother endangers the child's physical health and safety and places the child at risk of physical harm and damage.
>
> "b-2  [¶]  The child Baby [E.C.]'s mother, [J.C.], is a current user of methamphetamine which renders the mother incapable of providing regular care for the child.  [In February 2012], the mother used illicit drugs during the mother's pregnancy with the child and had a positive toxicology screen for amphetamine [in February 2012], at the child's birth.  The mother's use of illicit drugs endangers the child's physical health and safety and creates a detrimental home environment, placing the child at risk of physical harm and damage.
>
> "j-1  [¶]  The child, Baby [E.C.]'s mother, [J.C.], created a detrimental home environment for the child's sibling, Isaac G[.] (DOB: [2008]), by emotionally and verbally abusing the sibling. Such emotional abuse consisted of but was not limited to, the mother yelling and cursing derogatory and demeaning names at the

---

[4]  Mother identified Michael P. as E.C.'s biological father but indicated there was also a chance that Sergio G., (Isaac G.'s father), may also be E.C.'s biological father.  At the time, Michael P. was incarcerated in state prison.  Neither Sergio G. nor Michael P. is a party to this appeal.

sibling. Such conduct by the child's mother places the child at risk of suffering serious emotional damage."

At the March 5, 2012 detention hearing, the court found a prima facie case for detaining E.C. and found he was a minor described by section 300, subdivisions (b) and (j). The court ordered visitation for Mother with E.C. consisting of three monitored visits per week for three hours a visit.[5] The court also ordered weekly drug tests for Mother.

## B.    *Jurisdiction and Disposition Proceedings*

When interviewed for the jurisdiction/disposition report on March 19, 2012, Mother admitted her prior drug use. Mother, who was then 22 years old, disclosed that she started abusing marijuana when she was 15 years old and first tried methamphetamine when she was 19 years old. She stated that she smoked methamphetamine the day before E.C. was born. Mother reported she used the drug in the home of the maternal grandmother where Mother then resided. Mother believed the maternal grandmother was only aware of Mother's past marijuana use but not her methamphetamine abuse. Mother said she sometimes would get "irritable" while under the influence and would become violent when defending herself against Isaac G.'s father. Mother did not believe marijuana was a problem for her, but conceded that she had difficulty refraining from using methamphetamine.

Mother stated she enrolled in court-ordered services (parenting, domestic violence and anger management) in January 2012, after Isaac G. was detained. The report also noted that Mother had not yet visited E.C. since he had been detained on February 29, 2012. The Department recommended that the juvenile court sustain the petition and declare E.C. a dependent of the court.

---

[5]    The Department also recommended that the juvenile court place E.C.'s sibling, Isaac G., in the home of his paternal uncle, Carlos G. Carlos G. and his wife were also willing to have E.C. placed in their home.

On April 12, 2012, the dependency court sustained the section 300 petition, removed E.C. from parental custody, and ordered family reunification services for Mother. The court ordered Mother to participate in a drug treatment program with drug testing, parenting classes, and individual counseling to address case issues, including domestic violence and anger management. The court also ordered monitored visits for Mother of three visits per week, three hours per visit.

The six-month status review report revealed that during the months of April and May 2012, Mother visited E.C. once a week, for three hours. Mother did not, however, visit E.C. in the month of June. Mother moved out of the maternal grandmother's home. Mother had failed to provide the Department with her new address or telephone number. The social worker was unable to contact Mother during the month of June 2012. Mother contacted the Department on July 1, 2012, "stating that she ha[d] fallen into some difficult times and needed assistance from [the Department]." On July 11, 2012, Mother received referrals for the services. As of July 2012, Mother had not completed any of her court-ordered programs and did not have stable housing.

On July 27, 2012, E.C. was placed in the home of Isaac G.'s paternal uncle, Carlos G. The Department reported Carlos and his wife treated E.C. as their own child. They were not, however, interested in adopting him.

The 12-month status report indicated that Mother had not been consistent with her visits with E.C.; Mother failed to visit E.C. in June, July, and August 2012. Mother visited him once in September and once again in October 2012. Mother also failed to call the paternal uncle to notify him that she would not be attending visits. As of October 30, 2012, Mother had not enrolled in a drug treatment program, was not participating in individual counseling, and did not have stable housing. The Department recommended that the juvenile court terminate Mother's family reunification services.

At the October 30, 2012 status review hearing, the juvenile court terminated Mother's family reunification services with respect to E.C., and scheduled the matter for a section 366.26 hearing. The court also reduced Mother's visits with E.C. to one visit per month, for one hour per visit.

5

*C.*     *Section 366.26 Proceedings*

In its February 26, 2013 section 366.26 report, the Department indicated Mother had been given a visitation schedule, but had not been consistently visiting E.C.  On November 7, 2012, Mother and the maternal grandmother had a visit with E.C. and Isaac G. at the Department office.  Mother and the maternal grandmother did not visit the children during the month of December but visited them again on January 7, 2013.  They both missed the February 2013 visit.

The section 366.26 report disclosed that the Department had identified a prospective adoptive family for E.C. – Mr. and Mrs. C., who were Isaac G.'s paternal grandparents.  The home study for Mr. and Mrs. C. had not been completed.  The court continued the section 366.26 hearing for E.C.[6]

On March 27, 2013, Mother and the maternal grandmother had another one-hour monitored visit with E.C. in the Department office.

The Department's July 30, 2013 addendum report revealed that Mr. and Mrs. C. were non-responsive with the adoption social worker and their application was ultimately closed.  The adoption social worker identified other families who were suitable prospective adoptive parents for E.C.

The October 29, 2013 status review report stated that in early August 2013, E.C. was placed in the home of Mr. and Mrs. P.  The Department reported that E.C. was able to adjust to his new home and connect with Mr. and Mrs. P. and their daughter.  The report noted that Mother and the maternal grandmother also had two more visits with E.C. at the Santa Fe Springs Department office, including a visit on August 30, 2013.  The report also disclosed that Mother had not complied with court orders to seek drug treatment, parenting classes and other aspects of the case plan.  It further alleged that the social worker received a report that on October 2, 2013, Mother was "sleeping off her [drug] high" at a location where drugs were known to be sold.  The allegation was later

---

[6]     At the February 26, 2013, hearing the juvenile court returned Isaac G. to his father, Sergio G.'s, custody.

shown to be a case of mistaken identity. Nonetheless, it was also reported that Mother cancelled her scheduled visit for October 4, 2013, and rescheduled that visit to October 11, 2013. The report does not indicate whether the rescheduled visit took place.

The Department recommended that the juvenile court terminate Mother's parental rights over E.C.

At the October 30, 2013 section 366.26 hearing, Mother's counsel asked to set the matter for a contested hearing on the issue of termination of parental rights. The court asked for an offer of proof. Mother's counsel responded, "Your honor, [Mother] would like to prove to the court that she does have a strong relationship with [E.C.], and he would be strongly affected by terminating F.R." The Department responded that Mother had failed to maintain frequent and regular visitation with E.C. The following exchange occurred:

> "[Mother's Counsel]: Your Honor, today's report [Department Status Report dated 10-29-13] does not address any recent visitation with the Mother. The Mother indicates that she has had visitation since August.
>
> "[Department Counsel]: Your Honor, I would further draw the court's attention to page 8. . . . [the] report indicates that actually a visit had to be canceled because the Mother was sleeping off a high, so the visit was rescheduled for October 11th, and so maybe Mother had a visit on that date, but I don't believe that Mother's visitation rises to the level of her having a parental role in the child's life. And, clearly, she is still dealing with her drug addiction, and that it has impacted her ability to even have a monitored visit with the child. So, again, it is up to the court whether or not you want to give the Mother a contest or not.
>
> "[¶¶]
>
> "[Mother's Counsel]: Your Honor, the report,…the information that [Department Counsel] is referring to is inaccurate, and [Mother] would like the opportunity to contest that matter if that's what the court is going to be using against her. It is absolutely untrue that she was sleeping off a high on that date.

"[The Court]: I am not going to use that, but the fact that I did review all of the prior reports, as well, as to her participation with the child and the circumstances of the relationship with regard to the length of time that this has been ongoing, the lack of the parental relationship between Mother and the child. Based on the circumstances and the information the court has before it, the court does have discretion to allow for the contest, and based on the circumstances, I don't believe that it would be appropriate for the court to set the matter for a contest at this time. [¶] I do believe that it would be appropriate for us to go forward with the .26 today . . . ."

Mother's counsel then informed the court that Mother had just given birth to twins and had been attempting to enroll in an in-patient drug treatment program, but had been unable to do so because she was taking pain medication. Mother's counsel reiterated that Mother "would like to show the court that she does have a strong relationship with [E.C.]" The court denied the request for a contest. The court found by clear and convincing evidence that E.C. was adoptable and terminated parental rights over E.C.

Mother timely filed a notice of appeal.

### DISCUSSION

Mother contends that the juvenile dependency court erred and deprived her of due process of law when it refused her request for a contested hearing concerning whether the beneficial parental relationship exception applied to prevent the termination of her parental rights to E.C.

"Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) A section 366.26 hearing is a hearing specifically designed to select and implement a permanent plan for the child which is "stable, permanent, and that allows the caretaker to make a full emotional commitment to the child." (*Id.* at p. 306.) The legislative preference is for adoption. "Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child. The specified statutory circumstances – actually, exceptions to

8

the general rule that the court must choose adoption where possible – 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' (*In re Jasmine D.* [2000] 78 Cal.App.4th [1339], at p. 1348.) At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' (*Cynthia D. v. Superior Court* [1993] 5 Cal.4th [242] at p. 256.) The statutory exceptions merely permit the court, in exceptional circumstances (*In re Jasmine D., supra,* at pp. 1348-1349), to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

A single statutory exception is implicated here: "where a parent has maintained regular visitation and contact with a child who would benefit from continuing that relationship (§ 366.26, subd. (c)(1)(B)(i)). The beneficial parental relationship exception requires the parent contesting the termination of parental rights to show both regular visitation and contact and the benefit to the child in maintaining the parent-child relationship." (*In re Helen W.* (2007) 150 Cal.App.4th 1031, 1039.) The language "benefit from continuing the relationship" has been interpreted "to mean 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

To determine if the beneficial parental relationship exception applies, "'the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. [Citation.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.) "[I]f an adoptable child will not suffer great detriment by terminating parental rights, the court must select adoption as the permanency plan." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) "No one factor controls the court's analysis. It is a balancing test." (*Id.* at p. 231.)

9

The fact of a parent's regular visitation and development of a favorable, loving bond with the minor does not suffice to establish the parental relationship exception under section 366.26, subdivision (c)(1)(B)(i)). "A parent must show more than frequent loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The relationship arises from day-to-day interaction, companionship, and shared experiences.' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555, fn. omitted.)

Mother contends the juvenile court erred in concluding her offer of proof provided an insufficient basis upon which to grant her a contested hearing regarding this exception.

"[A] parent has a right to 'due process' at the hearing under section 366.26 which results in the actual termination of parental rights. This requires, in particular circumstances, a 'meaningful opportunity to cross-examine and controvert the contents of the report.' [Citations.] But due process is not synonymous with full-fledged cross-examination rights. [Citation.] Due process is a flexible concept which depends upon the circumstances and a balancing of various factors. [Citation.] The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court. [Citations.] Even where cross-examination is involved, the trial court may properly request an offer of proof if an entire line of cross-examination appears to the court to be irrelevant to the issue before the court. [Citations.]" (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816-817.)

Here Mother does not claim that the dependency court erred in requesting an offer of proof as a condition to setting the matter for a contest to determine the applicability of the beneficial parental relationship exception to termination of parental rights. Instead, she claims it was error to deny a contested hearing in this case in light of her offer of proof. Mother asserts that her offer of proof demonstrated that she could prove the

10

Department reports about her conduct in October were inaccurate and thus she was entitled to a full hearing to challenge the Department's conflicting evidence regarding her visitation with E.C.

Mother's offer of proof was insufficient to warrant a contested section 366.26 hearing. We discern no genuine conflict in the evidence. When the credibility of conflicting evidence is at stake juvenile courts should permit parents to present oral testimony and confront and cross-examine the witnesses against them. (See, e.g., *In re Clifton V.* (2001) 93 Cal.App.4th 1400, 1404-1405 [in the context of a section 388 petition]; *In re Matthew P.* (1999) 71 Cal.App.4th 841, 849-851 [same].) However, that is not the case before us.

The only purported conflict in the evidence that Mother cited in the offer of proof was the Department counsel's oral misrepresentation at the hearing regarding Mother's conduct and visits in October 2013—Department counsel inaccurately reported that Mother missed the October 4, 2013 visit because she was "sleeping off a high." A review of the Department's October 29, 2013 report, however, corresponds with Mother's counsel statement to the court that Mother did not miss the October visit because she was sleeping off the effects of her drug use. To be sure, the Department's oral representation was a mischaracterization of the Department's report; nonetheless, the Department counsel's representation, though inaccurate, is not itself a conflict in the evidence. Indeed, the court had before it the Department's report at issue, and thus the court could discern that the Mother had not missed the visit for the reason given by Department counsel. That said, Mother's offer of proof presented no genuine conflict in the evidence warranting a contested hearing. In any event, the court indicated that it was not going to consider the purported misinformation about Mother's conduct in October 2013 when deciding whether to terminate parental rights. Instead, the court stated it relied on other evidence in the reports that showed Mother lacked a parental relationship with E.C.

11

In addition to failing to demonstrate a conflict in the evidence to warrant a contest on the termination issue, Mother's offer of proof also lacked specificity as to what she planned to prove at a full evidentiary hearing. Mother's offer of proof included a mention that the October 29, 2013 status report "did not address recent visitation with Mother . . . and that Mother indicates that she had visitation since August." However, this offer failed to include any detail to show that any visitation in the months prior to the hearing was frequent or regular. "A proper offer of proof gives the trial court an opportunity to determine if, in fact, there really is a contested issue of fact. The offer of proof must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued." (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1124.) Moreover, the offer did not relate to other aspects of the beneficial parental relationship exception. Mother's offer of proof did not offer any suggestion as to what she would present to show that she occupied a parental role in the minor's life.

Indeed, the record supports the view Mother and E.C. had virtually no parent-child bond or significant relationship. Mother and E.C. did not interact when he was born, and Mother failed to maintain regular visitation prior to the termination of reunification services. Even after services were terminated when Mother's visits were reduced to once per month, her visitation with the baby was sporadic and irregular. There is no evidence in the record that Mother played a parental role with respect to E.C. Even assuming the juvenile court credited Mother's representation in the offer of proof that she had visits since August 2013, Mother nonetheless failed to even suggest how a couple brief visits, presumably at the Department offices, satisfied her burden of proving a beneficial parental relationship. Consequently, there was no issue of fact or law that would require an evidentiary hearing.

In sum, we conclude that where, as here, a parent's offer of proof raises no relevant issue of contest at a section 366.26 hearing, the trial court is not obligated to conduct a full evidentiary hearing, and denial of a contested hearing violates neither the parent's statutory nor due process rights.

12

*DISPOSITION*

The order is affirmed.


**WOODS, Acting P. J.**


**We concur:**



**ZELON, J.**



**SEGAL, J.** *


---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.